Phillip L. BUTTON, Plaintiff,

v.

Sandra KIBBY–BROWN, and Steven
L. McEvers, Defendants.

No. 94–3093.

United States District Court,
C.D. Illinois.

July 10, 1997.

James P. Baker, Springfield, IL, Mark S. Demorest, Troy, MI, for plaintiff.

Terence J. Corrigan, Springfield, IL, for defendant.

## *OPINION*

RICHARD MILLS, District Judge:

Prison chaplain—civil rights lawsuit—retaliation—First Amendment rights—jury trial.

At the close of plaintiff's case, judgment as a matter of law is granted to defendants.

## I. BACKGROUND

A. *Factual Background*

At the time of the events in question, Reverend Phillip Button was the chaplain at Jacksonville Correctional Center. He reported through a chain of command to Assistant Warden Sandra Kibby--Brown, who, in turn, reported to Warden Stephen McEvers.

On or about October 31, 1991, Chaplain Button met Michael Shannon, an inmate who was transferred to Jacksonville Correctional Center. Shannon was a "circuit rider," a term used for a highly fractious inmate who is transferred on disciplinary segregation status to various minimum or medium security prison facilities.

Chaplain Button, as part of his official duties, regularly visited Shannon in the segregation unit and counseled him in religion. During his visits with Shannon, Button discovered that the inmate was illiterate. At some time in or around December 1991, Shannon saw an ad on television for a reading program called *Hooked on Phonics* and asked Chaplain Button to help him write a letter to the makers of *Hooked on Phonics*. He also discussed his desire to acquire the reading program with Assistant Warden Kibby–Brown and asked her if his family could order the program and send it to him.

Assistant Warden Kibby–Brown discussed the matter with Chaplain Button. She told him that Shannon wanted to have his family buy *Hooked on Phonics* but that she would instead buy it with funds from the Inmate Benefit Fund. Button, however, offered to

write to the makers of *Hooked on Phonics* and ask them to donate the materials. The Assistant Warden agreed. Subsequently, Button wrote a letter to Gateway Educational Programs, the makers of *Hooked on Phonics,* requesting that the company donate the materials so that he could help Shannon become literate.

The company did, in fact, donate the program. In return, the company requested that a status report be given on Shannon's progress. No contract was ever entered into between Shannon, Jacksonville Correctional Center, or the Illinois Department of Corrections and the Gateway Educational Programs.

Assistant Warden Kibby–Brown, through her chain of command, asked Warden McEvers if Chaplain Button could teach Shannon to read from the program *Hooked on Phonics.* Warden McEvers denied the request. Thereafter, Button had a conversation with Deputy Director of Community Services Marjorie Brown ("Deputy Director Brown") concerning the denial of Button's request. Deputy Director Brown was outside Chaplain Button's chain of command.

Plaintiff testified that the conversation with Deputy Director Brown was a private conversation and that he asked to speak to her in a private office. He told Deputy Director Brown that he had received materials for Shannon but that Shannon was not going to be allowed to use them. He explained that if the Warden did not want the materials to be used with Shannon, the materials should be sent back to the company. Deputy Director Brown's recollection of the conversation was that someone had given, or Plaintiff had requested, the *Hooked on Phonics* program and that he wanted to help an inmate that was currently placed in segregation. Button's request had been denied and he wanted Deputy Director Brown's opinion on the situation.

The conversation prompted Deputy Director Brown to telephone Assistant Warden Kibby–Brown and tell her that there was an issue with an inmate in segregation and educational materials. Although Deputy Director Brown could not recall whether Assistant Warden Kibby–Brown had asked her to relate the contents of the discussion with Chaplain Button it was Deputy Director Brown's belief that the Assistant Warden would not have asked for that information.

Assistant Warden Kibby–Brown testified that Deputy Director Brown called because Button had talked to her about teaching, or using material with, Shannon. She told Deputy Director Brown that Warden McEvers had decided that an educator and not Chaplain Button would work with the *Hooked on Phonics* material with Shannon, but that she would ask him to reconsider his decision. Warden McEvers, however, did not alter his decision. Instead, an educator, Sam Holmes, was assigned to teach Shannon in regard to his reading. A copy of the *Hooked on Phonics* program was given to inmate Shannon, which he still possessed at the time of trial.

The Warden and the Assistant Warden were angered that Button went outside the chain of command in discussing the matter with Deputy Director Brown. Consequently, Assistant Warden Kibby–Brown called Button to her office to remind him of proper procedures in following the chain of command He claims the Assistant Warden told him that the Warden was going to fire him for talking to the Deputy Director. Immediately upon leaving the office of the Assistant Warden, Button told a group of inmates that he might be fired for "going to bat for" another inmate. On or about May 2, 1992, Chaplain Button was disciplined with a written reprimand for discussing and disclosing matters of a sensitive and personal nature with inmates. He alleges that this discipline was actually in retaliation for his conversation with Deputy Director Brown.

On May 18, 1992, Button made a statement to a correctional officer that the Health Care Unit was changing records after an inmate at Jacksonville Correctional Center died and, therefore, would be a place to avoid that day. Button was again disciplined with a written reprimand for making unprofessional statements to a fellow employee. Button claims, however, that this discipline was actually in retaliation for his conversation with Deputy Director Brown.

Button also claims that he was retaliated against when his application for an additional part-time position as a teacher at the Boot Camp associated with the Jacksonville Correctional Center was allegedly thrown away by Assistant Warden Kibby–Brown.

### B. Procedural Background

On March 15, 1994, Plaintiff Button filed a two-count Complaint against the Defendants in the Circuit Court for the Seventh Judicial Circuit of Illinois, Morgan County, Illinois. Count I alleged that the Defendants tortiously interfered with employment expectancy and Count II asserted that Defendants violated 42 U.S.C. § 1983 by retaliating against Plaintiff for exercising his First Amendment rights.

On April 8, 1994, Defendants Kibby–Brown and McEvers removed the case to this Court and soon thereafter moved to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). On May 19, 1994, this Court allowed the motion to dismiss and Plaintiff appealed. The court of appeals affirmed the dismissal of Count I for failure to state a claim but reversed the dismissal of the § 1983 claim. The reviewing court found that the complaint adequately alleged that the speech in question was a matter of public concern. The appellate court found that Plaintiff alleged that the conversation involved the prison's contractual liability and the possibility of illegal treatment of an inmate. However, the court of appeals stated that if discovery showed the conversation "really involved nothing about the prison's potential liability but rather concerned only personal matters, summary judgment might be appropriate." *Button v. Kibby–Brown,* No. 94–2349, 1995 WL 272677, at *5 (7th Cir.1995).

On November 30, 1995, Defendants filed a motion for summary judgment contending they were entitled to qualified immunity. This Court denied the motion stating that taking the evidence in the light most favorable to Plaintiff, a First Amendment violation occurred. Additionally, although the Court found it to be a tough question, when viewing the evidence in the light most favorable to Plaintiff, it was clearly established in March 1992 that Plaintiff's speech touched on a matter of public concern.

In response to Defendant's argument that they were only aware that Plaintiff was complaining about not being able to tutor the inmate, the Court noted that a factual dispute about what was said and what Defendants thought, or should have thought was said, existed. Consequently, the Court found it premature to determine whether qualified immunity applied.

Defendants' argument that they were entitled to qualified immunity because they had reason to believe the *Pickering* balancing test would favor their decision to discipline Plaintiff for his actions also failed. The Court found that Defendants did not state with particularity what interest they were upholding and failed to refute Plaintiff's contention that he did nothing wrong by talking to Deputy Director Brown.

At trial, Plaintiff alleged that his First Amendment rights were violated in that he suffered retaliation for having a conversation with Deputy Director Brown concerning the contractual liability on use of the donated *Hooked on Phonics* material and concerning the treatment of an inmate. At the close of Plaintiff's case, Defendants moved for judgment as a matter of law pursuant to F.R.C.P. 50(a).

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 50(a)(1) clearly establishes the standard by which a district court should decide a motion for judgment as a matter of law:

> If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

*See also Mayer v. Gary Partners and Co., Ltd.,* 29 F.3d 330, 335 (7th Cir.1994). Thus, the standard for deciding motions for judgment as a matter of law mirrors the standard

for deciding a motion for summary judgment. *Shields Enterprises, Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir.1992). "In either case, the district court must enter judgment if, under the governing law, a reasonable fact-finder could not find for the nonmoving party." *Id.; Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). If a reasonable jury could find for the nonmoving party, judgment as a matter of law is inappropriate. *Shields Enterprises*, 975 F.2d at 1294.

## III. ANALYSIS

Defendants claim they are entitled to a directed verdict both substantively and based on qualified immunity.

■ To recover on a First Amendment retaliation claim, the plaintiff must prove: "1) the speech engaged in was constitutionally protected under the circumstances; and 2) that defendants retaliated against him because of that speech." *Gorman v. Robinson*, 977 F.2d 350, 354 (7th Cir.1992). In determining whether the Plaintiffs engaged in protected speech, the Court must first determine whether the speech involved a matter of public concern. *Pickering v. Board of Educ. of Tp. High School Dist. 205*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968). If so, the next step is to "balance the interests of the [employee], as a citizen, in commenting upon matters of public concern and the State's interest, as an employer, in promoting the efficiency of the public services it performs." *Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734–35.[1]

■ Thus, this Court must first determine whether Plaintiff spoke on a matter of public concern. According to *Connick v. Myers*, to decide whether a statement is a matter of public concern, the court must examine the "content, form, and context of a given state-

ment, as revealed by the whole record." 461 U.S. 138, 147–148, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983). Content is the most important factor. *Campbell v. Towse*, 99 F.3d 820, 827 (7th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 1254, —— L.Ed.2d —— (1997). "[W]hen a public employee speaks not as a citizen upon matters only of public concern, but instead as an employee upon matters of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to view the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Connick*, 461 U.S. at 147, 103 S.Ct. at 1690.

■ While Plaintiff's motive is not dispositive, consideration of motive may clarify whether Plaintiff spoke as a concerned citizen or whether the purpose of his speech was to further some purely private interest. *Campbell*, 99 F.3d at 827. The Seventh Circuit has directed attention to " 'the point of the speech in question; was it the employee's point to bring wrongdoing to light? Or to raise other issues of public concern, because they are of public concern? Or was the point to further some purely private interest?' " *Cliff v. Board of Sch. Comm'rs of the City of Indianapolis, Ind.*, 42 F.3d 403, 410 (7th Cir.1994), quoting *Smith v. Fruin*, 28 F.3d 646, 651 (7th Cir.1994), quoting *Linhart v. Glatfelter*, 771 F.2d 1004, 1010 (7th Cir.1985) (other citations omitted).

■ This Court is mindful, however, that First Amendment protection is not thwarted just because Plaintiff may have had a personal stake in expressing his view. *Campbell*, 99 F.3d at 827. Nor does the fact that Plaintiff made his views known in a private setting automatically lead to the conclusion that his speech is unprotected. *Id.*

Yet where consideration of motive and context indicate that an employee's speech

---

1. Factors to consider in deciding the extent to which an employer may legitimately take adverse employment action: 1) the effect of the speaker's conduct on discipline and harmony among co-workers; 2) whether the employment relationship is one in which personal loyalty and confidence are necessary; 3) whether the speech impeded the speaker's ability to competently perform his daily duties; 4) the time, place or manner of the speech; 5) the context in which the underlying dispute arose; 6) whether the matter was one on which debate was vital to informed decisionmaking; and 7) whether the speaker should be regarded as a member of the general public. *Wright v. Illinois Dep't of Children & Family Servs.*, 40 F.3d 1492, 1502 (7th Cir.1994).

raised a topic: of general societal interest merely for "personal reasons rather than a desire to air the merits of the issue," ... or for the sole purpose of "bolster[ing][his] own position in a private personal dispute with [his] superiors," ... these factors militate against the conclusion that the employee's speech is entitled to First Amendment Protection.

*Campbell,* 99 F.3d at 827 (internal citations omitted).

■ The evidence at trial demonstrated that there was some dispute regarding the content of Plaintiff's conversation with Deputy Director Brown. In situations in which the actual content of the speech is in dispute, courts must "look to the facts as the employer *reasonably* found them to be." *Waters v. Churchill,* 511 U.S. 661, 677, 114 S.Ct. 1878, 1889, 128 L.Ed.2d 686 (1994) (emphasis in original). The Court does not find that Defendants' belief as to what was said was erroneous or unreasonable. Assistant Warden Kibby–Brown testified that Deputy Director Brown related to her that there was an issue with an inmate in segregation and education materials and asked her if she would reconsider allowing Plaintiff to tutor Shannon. Deputy Director Brown's testimony, while less than crystal clear, supports Assistant Warden Kibby–Brown's claim as to what Deputy Director Brown said to her. Plaintiff claims that the conversation involved the use of the donated materials (contractual liability) and unfair treatment of an inmate.

Defendants knew there was no breach of contract issue on the part of the prison. The evidence in the record demonstrates that there was no contractual liability on the part of the prison system or the Department of Corrections regarding the *Hooked on Phonics* material. Plaintiff's claim that he felt there was a moral obligation clearly does not rise to the standard that is required by law.

Defendants also knew that there was no unfair treatment of Shannon. Shannon had one educator working with him on math and reading and he did receive the *Hooked on Phonics* materials. In fact, the Court finds

that the officials at the Jacksonville Correctional Center bent over backwards to be of assistance to Shannon. Consequently, the Court finds reasonable Defendants' belief that Plaintiff's conversation with Deputy Director Brown related to Warden McEvers' decision to not allow Plaintiff to tutor Shannon and did not relate to any contractual liability or unfair treatment of an inmate.

The Court finds that based on the content of Plaintiff's speech, the primary purpose for speaking out was driven by his concern that he was not going to be allowed to tutor Shannon and was intended to benefit only his personal interests in a private dispute with his employer. Even if the conversation regarding Warden McEvers' decision to not allow Plaintiff to tutor Shannon did involve an issue of interest to the public, the Seventh Circuit has stated that the public concern element is lacking if speech "concerns a subject of public interest but the *expression* addresses only the personal effect upon the employee...." *Marshall v. Porter County Plan Comm'n,* 32 F.3d 1215, 1219 (7th Cir. 1994) (emphasis in *Marshall*), citing *Smith v. Fruin,* 28 F.3d at 651–52. Plaintiff's expression addressed only the personal effect upon him.

The form of Plaintiff's speech also supports the finding that Plaintiff was not speaking on a matter of public concern. Plaintiff engaged in a private conversation with an administrator outside of his chain of command and he did not ask her to take any action.[2] Additionally, the speech was made in the context of being denied the opportunity to work with Shannon, a decision with which Plaintiff was unhappy.

■ Based on the content, context, form and motive of Plaintiff's speech, the Court finds that Plaintiff's conversation with Deputy Director Brown was primarily a personal one and did not involve a matter of public concern Plaintiff spoke more like a disgruntled employee whose statements were primarily of personal interest rather than like a citizen. *See Colburn v. Trustees of Indiana*

---

**2.** While public dissemination is not required to conclude that speech was a matter of public concern, the absence is another indication of the

purpose behind Plaintiff's speech. *See Cliff,* 42 F.3d at 411.

*Univ.*, 973 F.2d 581, 585 (7th Cir.1992)(court must determine whether the speaker is speaking "more like a citizen or a disgruntled employee whose statements are primarily of personal interest."). Plaintiff's attempt to turn the conversation into one involving breach of contract and treatment of an inmate, both of which would be matters of public concern, fails, as there was no contractual liability on the part of the prison nor any unfair treatment of an inmate.

## IV.  CONCLUSION

The evidence demonstrates, and Defendants reasonably believed, that Plaintiff's conversation with Deputy Director Brown involved a personal dispute regarding Warden McEvers' decision to not allow Plaintiff to tutor Shannon. There was no evidence of a breach of contract or unfair treatment of an inmate.

After examining the content, context, form and motive of Plaintiff's speech, the Court finds that Plaintiff's speech did not involve a matter of public concern. Judgment as a matter of law is hereby awarded to Defendants. Plaintiff's oral motion to reconsider is denied. Judgment is to be entered for the Defendants. Each party to bear their own costs.